## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No.:_____

- **GIROLAMO FRANCESCO MESSERI** *pro se*,

**Plaintiff**,

**v.**

- **The University of Colorado Police Department Boulder, Colorado**,

- **University of Colorado Boulder Police Department Chief MELISSA ZAK**, individually and in her official capacity of Chief of the University of Colorado Boulder Police Department,

- **University of Colorado Boulder Police Department Sergeant STEVEN COWLES**, individually and in his official capacity as Sergeant of the University of Colorado Boulder Police Department,

- **University of Colorado Boulder Police Department Lieutenant JOHN KISH**, individually and in his official capacity as Lieutenant of the University of Colorado Boulder Police Department,

- **University of Colorado Boulder Police Department Corporal KENNETH PACHECO**, individually and in his official capacity as Corporal of the University of Colorado Boulder Police Department,

- **University of Colorado Boulder Police Department Officer CHADWICK BERRY**, individually and in his official capacity as Officer of the University of Colorado Boulder Police Department,

- **University of Colorado Boulder Police Department Officer ELLIS VON RIVENBURGH**, individually and in his official capacity as Officer of the University of Colorado Boulder Police Department,

- **University of Colorado Boulder Police Department Records Technician FRANCES NORTON**, individually and in her official capacity as Records Technician of the University of Colorado Boulder Police Department,

- **University of Colorado Boulder Police Department Evidence Technician JONATHON STEVENSON**, individually and in his official capacity as Evidence Technician of the University of Colorado Boulder Police Department, and

1

- **University of Colorado Boulder Police Department CHARLES HESKETT**, individually and in his official capacity as Evidence Technician of the University of Colorado Boulder Police Department.

**Defendants**.

## COMPLAINT AND JURY DEMAND

Plaintiffs Girolamo Francesco Messeri ("Giro") *pro se,* as and for his complaint against Defendants The University of Colorado Police Department in Boulder, Colorado ("CUPD"), Melissa Zak ("Zak"), Steven Cowles ("Cowles"), John Kish ("Kish"), Kenneth Pacheco ("Pacheco"), Chadwick Berry ("Berry"), Ellis Von Rivenburgh ("Von Rivenburgh"), Frances Norton ("Norton"), Jonathon Stevenson ("Stevenson) and Charles Heskett ("Heskett"), respectfully alleges as follows:

## THE NATURE OF THE ACTION

1.      Plaintiff Girolamo Francesco Messeri is one of a number of innocent male University of Colorado Boulder ("CU Boulder") students caught up in a scheme by CU Boulder and local law enforcement to criminally prosecute young men accused of sexual misconduct—despite a lack of evidence to support the allegations—while exacting harsh criminal prosecution and arrest, beside disciplinary measures, including expulsion.

2.      University of Colorado Boulder Police Department ("CUPD") and the Boulder District Attorney's Office improperly relies on their close relationships with the University of Colorado Office of Institutional Equity and Compliance ("OIEC") to push for malicious prosecution of its male students as part of a plan to repair the University's well-established reputation for failing to support female victims of sexual assault or to adequately punish men found responsible for sexual misconduct. Inevitably, innocent young men are swept up in this flawed, discriminatory, and malicious process.

3.      As with other male students (the case of William Norris, who was expelled, criminally, arrested, and then acquitted, around the same time of Messeri's case, is a perfect example), an egregious miscarriage of justice, occurred in Plaintiff's case when, in the first semester of his first year at the university, he was subjected to a flawed, biased and malicious prosecution, carried out under a presumption of guilt, and willful ignorance of major inconsistencies in the complainant, "Jane Doe's,"[1] false allegations of non-consensual sexual intercourse (oral copulation) against Plaintiff.

4.      Among the many issues that plagued the process to which Plaintiff was subjected, Jane Doe's credibility issues were never properly addressed by CUPD investigators, nor was her

_____
[1] Jane Doe is a pseudonym

account really questioned, evidence was falsely altered, statements in favor of Giro omitted, and statements against him falsely added.

5.      In Plaintiff's case, CUPD investigators also permitted Jane Doe to explain away or otherwise not address, clear, exculpatory evidence, and attributed more credibility to the varying accounts of Jane Doe and her witness over the unwavering and consistent statements of Plaintiff Giro and his witness. Not only was there an utter lack of evidence to criminally prosecute Plaintiff Giro, but there was no "probable cause" to support the investigators' finding that Plaintiff Giro was responsible for sexual assault.

6.      Without any evidence of wrongdoing, CUPD had Plaintiff evicted from his dorm in front of all his friends and suitemates, like the worst criminal on earth, and banned from all other dorms. This occurred even though Jane Doe was not a student at CU Boulder and there was no basis to conclude that Plaintiff posed any threat to the campus community. Plaintiff was forced to live in a hotel for the duration of the time in which the University investigated Jane Doe's allegations, until he was expelled by CU Boulder on November 23, 2016, the day before Thanksgiving.

7.      After Plaintiff's departure from CU Boulder, CUPD officers and Boulder County District Attorney, pressed for criminal prosecution in Plaintiff's absence—he had returned to his family home in Italy because he was expelled from CU Boulder on November 23, 2017, and had no place to stay - and obtained both a Warrant for search of any document related to his case in the CU's OIEC Office, and on January 20, 2017, when he was in Italy, unknown to Giro, they obtained a Warrant for his arrest.  The motivation behind CUPD Officers' malicious conduct was, among other things, to show public opinion, media, and students, that CU Boulder was "tough" against any case of sexual misconduct. CUPD Officers also sought to bolster the case against Plaintiff to justify

his unwarranted expulsion from the University.

8.      In May 2017, Plaintiff traveled back to the United States from Italy, but was not arrested at the time due to a spelling error in the warrant. On November 24, 2017, during a routine traffic stop in Utah, Plaintiff was arrested on the outstanding warrant. He subsequently spent 33 days in jail, in inhumane conditions, moved from different jails in several States, with even worse inhumane means of transportation, before a hearing was held and he was released on a $10,000.00 bail, subject to the surrender of his Passport, to pretrial supervision and having to ask Boulder Court to be allowed to go back to Utah where he lived (he was prohibited from going outside the boundaries of Colorado and Utah). Approximately eight months from his seizure, after a disappointing (for CUPD Officers and consequently for the Boulder District Attorney) pretrial hearing, flawed by omissions, false statements, false representation of facts, and oversights, on July 30, 2018, the Boulder District Attorney's office formally moved to dismiss the charge due to a lack of evidence. The charge was subsequently dismissed by Boulder District Court on July 31, 2018. Regardless, Plaintiff's name and reputation, his career and studies opportunities, and future were all totally destroyed. He also sustained enormous economic injuries, and emotional distress, like did his parents, Iole De Luca, his mother, and Vincenzo Messeri, his father.

9.      CUPD investigation of Jane Doe's allegations were tainted by gender bias resulting from federal and local pressure to protect female victims of sexual violence, and to take a hard line against male students accused of sexual misconduct. As a result, Plaintiff Giro was deprived of a an adequate investigation, as mandated by the United States Constitution, was maliciously prosecuted and illegally seized and deprived of his freedom for a long period of time.

10.      Plaintiff, therefore, brings this action to obtain relief pursuant to 42 U. S. C. § 1983 – Violation of the Fourth Amendment of the United States Constitution, based on claims of Malicious Prosecution, false arrest and false imprisonment, the right to be free from unreasonable

seizure, and State law Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress.

## THE PARTIES

11.      Plaintiff Girolamo Francesco Messeri is a natural person and a resident of Utah.

12.      Defendant the University of Colorado Police Department in Boulder is the Police Department responsible for security on the University of Colorado Boulder campus.

13.      Defendant Melissa Zak is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Zak was the Chief of the University of Colorado Police Department in Boulder.

14.      Defendant Steven Cowles is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Cowles was a Sergeant of the University of Colorado Police Department in Boulder.

15.      Defendant John Kish is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Kish was a Lieutenant of the University of Colorado Police Department in Boulder.

16.      Defendant Kenneth Pacheco is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Pacheco was a Corporal of the University of Colorado Boulder Police Department in Boulder.

17.      Defendant Chawick Berry is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Berry was an Officer of the University of Colorado Boulder Police Department in Boulder.

18.      Defendant Ellis Von Rivenburgh is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Von Rivenburgh was an

Officer of the University of Colorado Boulder Police Department in Boulder.

19.     Defendant Frances Norton is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Norton was a Records Technician of the University of Colorado Boulder Police Department.

20.     Defendant Jonathon Stevenson is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Stevenson was an Evidence Technician of the University of Colorado Boulder Police Department.

21.     Defendant Charles Heskett is a natural person, and upon information and belief, a resident of the State of Colorado, and, at all times relevant herein Stevenson was an Evidence Technician of the University of Colorado Boulder Police Department.

22.     Names and roles of Defendants were taken from well known and established facts and from the Boulder Count District Attorney witnesses' list and CUPD "Summary" (Exhibit "A"). All Exhibits are true copies of their originals, with the exception of the yellow highlighting).

## JURISDICTION AND VENUE

23.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

24.     This Court has personal jurisdiction over CUPD Officers on the ground that they are conducting business within the State of Colorado.

25.     This Court has personal jurisdiction over Defendants CUPD, Zak, Cowles, Kish, Pacheco, Berry,

Von Rivenburgh and Norton on the ground that they were employed by CUPD and at all times relevant herein and personally acted within the State of Colorado and the District of Colorado.

26.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.   CU Boulder Faces Federal and Local Pressure

27.     On May 16, 2013, a female student at CU Boulder filed a complaint with OCR claiming that the school violated Title IX by failing to issue a severe enough sanction against a male respondent who was found responsible for sexual assault. The complaint was widely publicized, with the female student stating that she was forced to "do the dirty work that the university couldn't do." Shortly thereafter, OCR opened an investigation at CU Boulder. Local press noted that OCR had the power to "refer the case to the Department of Justice for prosecution or seek to block federal funding for the university."

28.     On May 1, 2014, the DOE issued a press release naming CU Boulder as one of the initial 55 colleges and universities being investigated for violating Title IX. Then Assistant Secretary of Education Catherine Llhamon  stated that the schools were being named "in an effort to bring more transparency to our enforcement work and to foster better public awareness of civil rights." Per the press release, "[r]eleasing this list advances a key goal of President Obama's White House Task Force to Prevent Students from Sexual Assault…. The Obama Administration is committed to putting an end to sexual violence—particularly on college campuses." The press release continued, "all universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding

or be referred to the U.S. Department of Justice for further action."

29.     On May 1, 2014, CU's Chancellor DiStefano issued a letter to the campus, acknowledging the OCR's public disclosure of the investigation of CU Boulder and outlined the University's efforts to comply with Title IX since the opening of the investigation. DiStefano also referenced the White House's Not Alone report and noted "I am aware that many of our students are circulating a petition asking for us to form a task force…to implement the White House's recommendations… . I pledge to you that we will review all the White House recommendations and integrate those elements into what we are currently doing, all with the goal to move us beyond mere compliance, into leadership."

30.     On May 1, 2014, the CU Independent, the campus newspaper, addressed the OCR announcement that CU Boulder was under investigation, noting "CU Boulder has come under fire for claims related to sexual assault multiple times in the last year."

31.     On May 10, 2014, local press reported that CU Boulder settled the "sexual assault case that sparked Title IX investigation" with the female complainant. The female complainant went on record stating that the University needed to change its policies "for all future survivors so the campus is a lot safer for them and the policies really cater towards survivors' needs." In response, a University spokesperson publicly declared that CU Boulder was committed to complying with and exceeding Title IX requirements.

32.     On June 12, 2014, Chancellor DiStefano announced that the University had hired "education and civil rights lawyer," Valerie Simons, to serve as Title IX Coordinator for the campus. The announcement lauded Simons' previous position working for the United States Department of Justice, including a case "which involved the admission and integration of women at a formerly all-male state university."

33.     In January 2015, CU Boulder held a "sexual misconduct town hall" called "It's On

Us," named for the national "anti-sexual assault campaign."A focus of the meeting was the CU Boulder Police Department's shift in policies, to put "the survivor back in the driver's seat." Administrators at the meeting confirmed that campus institutions were "working hard to make the process as survivor-focused as possible."

34.      In February 2016, the CU Independent published an opinion piece which criticized CU Boulder for administering lax punishments in sexual misconduct cases and fostering a "rape culture…which…teaches young men that drunken hookups are a space of free reign where anything goes."

35.      On April 8, 2016, former Vice President Biden delivered a speech to the CU Boulder campus as part of the "It's On Us Week of Action." In preparation for the visit, Chancellor DiStefano and Title IX Coordinator Simons appeared in an "It's On Us" video. DiStefano announced that "we share the same goals as the Vice President…. The campaign is part of our comprehensive education and prevention initiatives to combat sexual violence and it complements our overall efforts during the past two years to become a national model in this area."

36.      In his April 8th speech, Vice President Biden focused on protecting women from sexual assault, discussing the faulty 1 in 5 statistic and stating "whether you're already in bed with him and you change your mind, no means no!" Biden further advised men on campus to "look in the mirror and ask, are you being the man you think you are?" The speech was described by the CU Boulder Alumni Association as a "test of character." CU Boulder's Office of Government Relations also wrote about the visit in its Government Relations Newsletter.

37.      On April 28, 2016, CU Boulder announced its efforts to "combat" sexual assault on campus, relying on statistics garnered from a 2015 sexual misconduct survey. A CU Boulder law professor, Aya Gruber, criticized the results of the survey because the definition of sexual assault used in the survey did not match the legal definition. Per Gruber "this makes any sexual contact at

any time possible grounds for sexual assault." Valerie Simons left no room for discussion about this issue, and simply responded to the professor's observation by reiterating "we do have a sexual assault problem on campus, a very serious one."

38.     On July 7, 2016 CUPD and the University of Colorado's Office of Institutional Equity and Compliance (OIEC) signed a Memorandum of Understanding (Exhibit 1) providing that they will share information between them, work together on sexual assault cases, providing officers and investigators within their department/office with annual, specialized trauma-informed training and skills that emphasize avoiding questions and behaviors that may contribute to the re-victimization of a Complaint or witness, and conduct a victim-centered, offender-focused investigation. The above mentioned MOU is related to sexual assault matters only.

39.     On August 17, 2016, the CU Independent published the first of a three-part series about "the sexual assault epidemic," which noted the faulty 1 in 5 statistics, and criticized the University, stating "it is unclear whether the University has done anything that will be truly be effective." The article went on to criticize DiStefano and CU Boulder as treating men accused of sexual misconduct with "mercy" that "victims do not receive…. Here at CU, just like in the courts, the victim of sexual assault is treated as if they hold some responsibility for the crime committed against them." The article also encouraged "efforts at the university level must make up for flaws in the justice system and the ways in which the nation focuses on victim blaming."

40.     On September 6, 2016, CU Independent published the third part of the series, which advocated for mandatory minimum sentences in the education and legal system so that "rapists are punished in a way that better fits their crime."

**II.    The Incident Alleged to Have Occurred on September 10, 2016**

41.     Plaintiff began his freshman year at CU Boulder in August 2016. Weeks later, on

September 10, 2016, he and his roommate, W2 (Hunter) were walking around "the Hill" area of campus where they met Jane Doe and her friend "W1" (Jamie) Jane Doe and W1 were not students at CU Boulder and neither Plaintiff nor W2 had previously met either Jane Doe or W1. The group spoke for a while and W1 offered to drive Plaintiff and W2 back to their dorm.

42.     At one point, the group decided to spend time in Plaintiff's and W2's dorm room. While there, Plaintiff and Jane Doe began "making out" in front of W1 and W2. Shortly thereafter, the two went to the bathroom together, which was located in the dorm room. W1 and W2 remained in the room talking.

43.     Jane Doe and Plaintiff were in the bathroom for less than five minutes. During that time, they continued making out and Plaintiff asked Jane Doe if she would perform oral sex on him. She agreed. Plaintiff removed his belt, and Jane Doe unzipped his pants and began performing oral sex. After a few minutes, Jane Doe stopped and told Plaintiff she was not feeling well and that she wanted to go back into the room to be with her friend, W1. Plaintiff understood and nothing more happened between them. The two exited the bathroom, with Jane Doe exiting first and Plaintiff following behind her.

44.     After the sexual interaction between Jane Doe and Plaintiff, they continued to spend time together, including standing outside the dorm, where Jane Doe smoked marijuana with W1, and attending a party on the 15th Floor of Plaintiff's dorm. While they were at the party, a campus security officer came in to advise the students to lower the noise level. Jane Doe did not seek assistance from the security officer nor did she attempt to leave the presence of Plaintiff and W2 at any time.

45.     On the contrary, when Jane Doe and her friend W1 finally decided to leave the dorm, they pressed all the buttons on the elevator and spent time laughing and posting photos of themselves on social media as they stopped at each floor. Jane Doe and W1 also encountered

Plaintiff's roommate, W2, while riding the elevator. Video surveillance footage shows that they laughed and spoke with him before he departed the elevator. At no point in time did Jane Doe appear to be in distress. She and W1 spent approximately one and a half hours at Plaintiff's dorm after the alleged sexual assault.

46.     On or about September 12, 2016, Jane Doe reported to the Colorado University Police Department (the "CUPD") that Plaintiff had sexually assaulted her.

47.     On the same day, CUPD notified CU Boulder of Jane Doe's allegations against Plaintiff, and the OIEC (Office of Institutional Equity and Compliance) opened an investigation against Giro. The investigation itself turned out to be completely biased against him.

48.     CUPD then acted in concert with CU Boulder to build a case against Plaintiff, including sharing information from its investigation with CU, even though there was no evidence that an assault had occurred.

49.     This is not the first time that CUPD has engaged in such unjust tactics in order to push its agenda and be perceived—in the face of harsh criticism on campus—as taking a hard line against men accused of sexual misconduct. Unfortunately for CUPD, the criminal pipeline CUPD itself has created for sexual assaults complainants has cracked under the weight of justice.

50.     On November 8, 2016 CU's OIEC concluded the investigation and found Giro guilty of Sexual Assault-Non-Consensual Sexual Intercourse, and on November 23, 2016 (the day before Thanksgiving!) Valerie Simons, the Director of OIEC, issued a Notice of Sanction to Plaintiff, notifying him that Giro was immediately expelled, excluded from all University of Colorado campuses, and that his housing contract was terminated (Exhibit 2). Having nothing more to do in the US, no place to stay, and relying on his criminal attorney, Giro left the US for Italy on November 27, 2016.

51.     Though Plaintiff was initially informed by his criminal attorney that no charges would

be filed against him, unbeknownst to him, CUPD Sergeant Steven Cowles requested a warrant for his arrest to Boulder County District Court, after he left Colorado for his home in Italy in the wake of CU Boulder expelling him (he had no place to stay). Upon information and belief, the timing of the warrant was deliberate, as CUPD was fully aware that Plaintiff had left the country. The warrant request issued by Sergeant Cowles contained false statements and facts, incorrect information, omitted facts and information in favor of Plaintiff and added facts and information against him.

52.     Giro came back to the US in May 2017 to work at Montage Hotel, in Deer Valley, in Park City area, Utah, where he settled. On November 24, 2017, Plaintiff was arrested during a routine traffic stop in Utah. Plaintiff pled not guilty to the charges that were filed against him in absentia. He subsequently spent 33 days in jail, until the Boulder County District Attorney's Office moved to dismiss the charges against him, on July 30, 2018, because there was no "reasonable likelihood of conviction at trial." The charges were dismissed the following day.

**III.    CUPD Flawed and Biased Investigation Into Jane Doe's Allegations and Plaintiff's Malicious Prosecution.**

53.     After Jane Doe reported the alleged sexual assault to CUPD, on September 12, 2016, Plaintiff was immediately removed from his dorm and banned from all campus residence halls, even if Jane Doe was not a CU's student, Plaintiff posed no threat to campus security, and practically there was no accurate information about the case.

54.     Plaintiff Girolamo F. Messeri was removed by CUPD from his dorm in front of his suitemates, roommates, friends and other students, taken in a CUPD car and drove to a nearby motel, like a dangerous criminal.

55.     After Plaintiff was arbitrarily ejected from campus based on unproven allegations, CUPD commenced an investigation and Defendants Pacheco, Berry, Von Rivenburgh and Kish (the last was the one who also reviewed the Videos, including the elevators' videos. Exhibit 3) were

appointed to Plaintiff's case. Defendant Norton was the CUPD's Records Technician, so she is responsible for the transcript of the CUPD's Audio/Video interviews.

56.     CUPD cooperated, during the entire investigation, with CU's OIEC and its investigators in Plaintiff's case, Jessica Polini and Lauren Hasselbacher, and Director, Valerie Simons. They exchanged interviews of the complainant and witnesses, and other documents.

57.     On September 12, 2016 Officer Berry, then joined by Officer Von Rivenburgh and Corporal Pacheco, made the first interview of Jane Doe (Exhibit 4). She stated that she had "a few drinks" and she was "kinda drunk, but not really bad" (she was under-age) (According to the narrative on page 2 of Exhibit 5, of the same interview, Jane Doe states that she had ¾ of a bottle of white wine). She also stated that she followed Giro into the bathroom, and that W2 (Giro's roommate) asked to go out to smoke a cigarette (it will turn out to be marijuana in the following interview. Again, as for alcohol, she was underage). She added that wanted to leave but her friend W1 left the car's keys in Giro's room. Following W2 they went to a party on the 15th floor of the same dorm building, where a Resident Administrator knocked on the door and shut down the party after having given a warning to the owner of the room for the noise (it will be confirmed by all witnesses interviewed by CUPD). It is interesting and relevant to notice that the CUPD Officers allowed a representative of the OVA (Office of victims assistance) from CU was allowed to meet and talk to Jane Doe before the Police interview and her brother assisted to both the meeting with the OVA representative and the CUPD interview (CUPD Officers will confirm this at pre-trial hearing). Incredibly there are several discrepancies on the CUPD reports of the same interview of Jane Doe on September 12, 2016. On Exhibit 4 it is reported that she had a "few drinks" and she went out "to smoke a cigarette". On Exhibit 5 it turns out she had "3/4 of a bottle of white wine" and she went out to "smoke some marijuana (Exhibit 5 page 2). What is incredible is that no CUPD Officer asked Jane Doe why she did not report the sexual assault to the Resident Administrator who

showed up at the party on the 15th floor. She had been already assaulted, Giro was not there at that moment, and she could have easily reported the assault. However, CUPD Officers, and more specifically Officer Von Rivenburgh, denied during the entire investigation that an Administrator or Officer showed up at the party on the 15th floor, in contrast to even Jane Doe, her friend and witness W1, W2, W3, and W4 interviewed (page 5 of Exhibit 5). We should ask ourselves why a CUPD Officer should deny what six witnesses confirm! The answer is pretty simple. If CUPD admitted that an Officer showed up at the party on the 15th floor it would have been very difficult to explain why Jane Doe did not tell the Officer that she was sexually assaulted! It is evident that CUPD tries to build up a "probable cause" (that never existed!) in order to maliciously prosecute Giro! By the way, CUPD did not subject Jane Doe to any medical examination (including no "rape kit") that should have shown the signs of the force applied by Giro on her body.

58.     Since the beginning of the investigation CUPD Officers refer to Jane Doe as "victim". This is another sign that shows that Giro was considered

guilty since the beginning of the investigation, and that he was victim of a malicious prosecution.

59.     W3 (student Jonathan), Giro's suitemate, said that Jane Doe and W1 never came back to their room (as Giro and W2 said). So the fact that Jane Doe and W1 had to get back the car's keys that they left in the room, easily falls down, and demonstrates first, that the two girls lied, and that they remained in the building after the assault because they wanted to remain, not because the car's keys were on Giro's room. Obviously CUPD Officers never mentioned this statement of W3 (Jonathan)! He also added that a security guard broke up the party on the 15th floor (as said by everybody except CUPD' Officers!), and that the girls did not look drunk (Exhibit 5 page 5). From the audio of his interview we noticed that W3 said Giro is a "great kid", "a good guy" and "he knows what he wants to do here". Obviously all this has been omitted from CUPD transcript of the

interview done by Record Technician Norton! He also stated that: A) He heard from W2 that while him (W2), Messeri and the women were in Messeri's room, Messeri and Jane Doe were kissing and they were both into it; B) He also said that W2 told him that the woman (Jane Doe) was into kissing Messeri and was "not backing off"; C) He heard from a friend that the woman (again Jane Doe) was all other Messeri and was romantically interested in him. All this is enough to understand that CUPD's Officers had no probable cause to criminally charge Giro, and that they maliciously prosecuted him.

60.     W4 (student Michael) confirms that a security guard broke up the party on the 15th floor. He added that Giro was not drinking alcohol (Exhibit 5 page 5).

61.     Giro had an interview on September 12, 2016, just a few hours after Jane Doe reported the assault to CUPD. From the interview audio, and also from the transcript, is evident that he had problems understanding and expressing himself in English (he was in the US since three weeks and English was not his primary language). Officer Von Rivenburgh did not investigate… further. He had no reason, because his only interest was to charge and arrest Giro, even if the interview Von Rivenburgh states that Giro "sounded genuine". How can you say that someone sounds genuine and then have him arrested?

62.     W1 ("Jamie", Jane Doe's best friend of more than two years and her witness), was Interviewed on September 13, 2016. From the interview's transcript (Exhibit 5 page 6) it is evident that she in contrast with Jone Doe. She states that they "only shared two bottles of an alcohol spritzer that had 2% alcohol", and they did not have any alcohol in Giro's room when Jane Doe said that they had some white wine! No words of this discrepancy by the CUPD Officers! She again contradicts Jane Doe saying that that Giro "grabbed Jane Doe's hand and forcefully pulled her out of the room, toward the bathroom" when Jane Doe said she followed Giro! CUPD Officers are totally silent on this point because they were trying to "build" their "probable cause" (inexistent!)

to ask the warrant for Giro's arrest. They exploited the girls' statements, even if contradictory, false, denied by other witnesses, videos and facts, because they were maliciously prosecuting Giro, in order to protect and "embellish" CU's behavior at a moment when the University was under an investigation by the OCR and media and public opinion on its handling of sexual assaults on campus. This was also noticed by the U.S. Court for the District of Colorado in its Order dated September 23, 2019 (Exhibit 6). W1 also contradicts herself when she says that Jane Doe came out of the bathroom "looking fine and not disheveled". Just after she says that Jane Doe appeared "very upset when she came out of the bathroom and Jane Doe was holding her head shacking" (Exhibit 5 page 6)! She added that Jane Doe told her, that after she came out of the bathroom, "I think I was assaulted" and "we need to leave right now". This is at least three time in conflict: A) With Jane Doe narrative that said that she told W1 she was assaulted when they were downstairs smoking marijuana (Exhibit 5 page 2); B) With her own statement at the interview with CU's OIEC (Exhibit 7), when she said that Jane Doe told her about the alleged assault when they went downstairs smoking marijuana; C) Why the girls didn't took the car's keys if she knew of the alleged assault when they were still in Giro's room, with her belongings at hand! Beside the fact that how can someone say "I think I was assaulted"! Again, the behavior of CUPD's Officers is incredible! No words on the absolute contradictions and inconsistencies of the two girls! This confirms that they had no "probable cause" to request the warrant for Giro's arrest, and they maliciously prosecuted him!

63.     W2, Giro's roommate since three weeks, was interviewed by CUPD Officer Von Rivenburgh on September 13, 2016. He told the Officer that Jane Doe was "definitely flirting with him (Giro) (Exhibit 5 page 7). He told Von Rivenburgh that before they left the room (so after the "bathroom alleged assault" and before going downstairs) they were whispering and they were mutually "liking each other". Her demeanor, after they exited the bathroom, was not upset, W2

told CUPD. W2 confirms the fact that at the party he went with the two girls, on the 15th floor, a "cop showed up and asked questions about alcohol in the room. So, he confirms too that an officer showed up at the party on the 15th floor, where the girls were too, after the alleged assault. CUPD's Officers never asked Jane Doe why she didn't tell the Officer on the 15th floor about the alleged assault. On the contrary! They couldn't find the Officer that was seen by six people including Jane Doe! It is obvious that CUPD's Officers are omitting extremely important details that would have invalidated any "probable cause" for the request of Giro's arrest warrant and prosecution. And it is impossible they did not realize it! On the contrary, they realized it very well, and they maliciously omitted these information in order to "help" CU that was under investigation by the OCR of the DOE for the way they were handling sexual assault cases on campus. W2 in his interview with CUPD Officer Von Rivenburgh, states that Giro is not a drinker, drugs taker, or partier, and he likes to go to bed early. He also stated that they (Giro and him) did not drink that night and Giro did not ask or pressed the girls to drink. So, for some "unknown" reasons on the "Report narrative" dated September 13, 2016, **Officer Von Rivenburgh lying stated that Giro was drinking that night** (Exhibit 5 page 7) ("I asked W2 if Messeri and he were drinking at all that night and he stated they were"). This is a **huge lie contradicted by the audio of the interview!** W2 himself **very strongly denied** having said it in his interview with CU's OIEC on September 23, 2016 (Exhibit 8). It is obvious that we are to a point where **CUPD Officers and the Technician are lying, manipulating transcripts of a witness interview, adding inexistent facts against Giro like the car's keys and the fact that he was drinking that night, and omitting extremely important evidence like a fair description of what happened in the elevator when the girls were riding it, and lying down on the elevator itself, and stopping it at each floor to chat with boys. It is evident to anyone that CUPD's Officers built up a malicious prosecution against Giro to assists CU in its investigation ordered by the OCR and media's, public opinion's and students'**

**attacks on how they handled sexual assault complaints on campus! They lacked any real probable cause to ask the warrant for his arrest and acted with reckless disregard for the truth!** W2 also told Officer Von Riveburgh that Jane Doe was upset when Giro left the elevator to follow another girl. This fact was never thoroughly investigated by CUPD's Officers because they were just interested in charging Giro with sexual assault and having him arrested, and they were afraid that the truth could come out: that Jane Doe accused Giro just out of jealousy! W2 added that the two girls were with him only (without Giro) on the 15th floor party. So why they didn't ask W2 for the car's keys? W2 also confirms that Jane Doe's demeanor was fine after she came out of the bathroom. He also stated that **JANE DOE WANTED TO GO TO THE BATHROOM WITH GIRO** ("Yeah, it was definitely – they were mutual – yeah") (12:10 of the audio recording of W2 interview). Obviously **THIS IS EXTREMELY IMPORTANT STATEMENT IS TOTALLY OMITTED ON THE CUPD REPORT OF THE INTERVIEW** (Exhibit 5 page 7 compared with Exhibit 9 page 8). So, Von Rivenburgh adds in his reports what does not exist in W2 interview, in order to show that Giro was a drinker (false!) and omits what W2 told him about Jane Doe mutually entering the bathroom with Giro, that they liked each other and they were "hitting off pretty good". Von Rivenburgh asked W2 how Giro and Jane Doe looked exiting the bathroom and if any of the two looked upset. Answer: "No, I don't remember her being upset. I mean the only reason I think she got upset was after Giro like left her in the elevator. So she seemed fine – yeah she seemed fine" (Exhibit 9 pages 8, 9 and 10).

64.     Officer Von Rivenburgh contacted Jane Doe via telephone on September 14, 2016, two days after she reported the alleged sexual assaults, and asked her "on a scale of 1-10 with 1 being completely sober and 10 being the most intoxicated you've ever felt how did you feel that evening? Jane Doe stated "four to five. I was drunk but I still knew what was happening around me" (Exhibit 5 pages 8 and 9). Again, Jane Doe's statements are in contrast with W1 (her friend and witness),

20

W2, and herself in the previous interview. But Officer Von Rivenburgh did not challenge her account, as usual he did for Jane Doe and W1.

65.     Officer Von Rivenburgh conducted a "structured video-recorded interview" coordinated with CUPD's Sergeant Steven Cowles (Exhibit 10) of Jane Doe on September 16, 2016. Jane Doe stated "I was drunk so I was like….oh okay" "Definitely more drunk then high". She even says that she had alcohol with Giro in his room; a fact totally and forcefully denied by W2! She confirms that W1 was her best friend, having known each other a couple of years. Officer Von Rivenburgh asked her about the elevator's video and her answers were totally inconsistent or she couldn't answer or she lied ("So Jamie hit all the buttons" of the elevator. From the video, we can easily see that Jane Doe pressed all the buttons too).  Officer Von Rivenburgh continued his questioning and asked her what happened in the bathroom. However, Von Rivenburgh omitted to ask her why she did not "resist" to Messeri; why, for example did not bite his penis or refused to open her mouth. The conclusion is that no Police Officer is saying anything to counter her meaningless answers. On the contrary, CUPD's Officers are "buying" everything. Everything that is against Giro, even if it is totally inconsistent! For example, they did not challenge her account of why W1 pressed all the elevator's buttons ("Jamie was high, so we had no idea ….like is it the ground floor. Oh I don't know. So Jamie hit all the buttons". Exhibit 10) or why she did press the buttons too as the video shows. The Police Officers, who saw the video should have noticed that she was lying, because she pushed the buttons too! But Officer Von Rivenburgh and Sergeant Cowles were happy with her answers, authorizing her to lie!

66.     At the end of the "structured" interview of Jane Doe (at minute 12:11 in the video of the interview) Von Rivenburgh said to Jane Doe that Giro would be charged, and quite fast too! This was the first through interview of Jane Doe and the beginning of the investigation. How can he say such a thing? Do we need anything else to demonstrate the malicious prosecution of CUPD's

Officers? Why? Because the rule by CUPD, at that time, in Boulder was: Maliciously prosecute as much boys as possible, even without probable cause, in order to look tough to the media and public opinion! Giro's case is very similar to CU's Boulder student William Norris, who was maliciously prosecuted just a few weeks before Giro's case and then was totally cleared by a Jury in 29 minutes! Jane Doe could not even logically explain why she remained in the building for approximately 100 minutes (!) after the alleged assault and she was in no hurry at all to leave the building, the opposite, she wanted to stay, as we can see from the elevator's video and from W2 recount. The girls'account of the car's keys is not "holding" as we can see from facts and W2 narrative. There is no explanation on CUPD's behavior except that they were building up a malicious prosecution against Giro that will also lead to his arrest without probable cause!

67.    On October 27, 2016, approximately six weeks after the first "structured" interview, Officer Von Rivemburg conducted a follow-up interview with Jane Doe. The main topics were the "elevator ride" and the "car's keys". And again the answers of Jane Doe were totally against the logic, the truth, and in contrast with the other witnesses. She couldn't explain at all why she didn't go directly to the first floor, she couldn't explain what was going through her mind! NO ANSWER! She had no answer! She couldn't explain, with a valid reason, why she didn't leave the building. She is in total contradiction with W2 about the girl exiting the elevator on the 6th floor following Giro (Exhibit 11). She now again says (after the first interview) that she was drunk! She also confirms the "car's keys" issue in contrast with W2 and W3. Even with all these inconsistencies, these lies, CUPD Officers took her for good and considered her, and W'1s, statements to be a "probable cause" for asking a warrant for the arrest of Giro and charging him with sexual assault. This is absolutely unreal, except in a case of malicious prosecution, like our case, as also noticed by the U.S. District Court for the District of Colorado (Exhibit 6).

68.     The review of the videos, of which Evidence Technicians Jonathon Stevenson and Charles Heskett were responsible, made by Corporal Pacheco and Officer Von Rivenburgh and Lieutenant Kish is totally false (Exhibit 5 page 8)!

A)  They wrote that at 1:07:20 Messeri exits #2 elevator, following an unknown girl on the 1st floor. False! They went out on the 6th floor! In fact looking at the next video Giro enters elevator #1 on the 6th floor at 1:07:53. It would have been impossible to walk up from the 1st to the 6th floor in 33 seconds!

B)  At 1:31:40 W1 hits the elevator's buttons for all floors, but CUPD's Officers did not "noticed" that at 2:40 in the video, Jane Doe presses several floors' buttons (almost everyone)! This is in contrast to her statements to CUPD. Was she in a "moment of reflection" like she said and W1 was pushing all the elevator's buttons to all floors? NO! She pressed all buttons too and she was not in any hurry to leave the building after being allegedly "sexually assaulted"! The opposite! She wanted to stay in the building and this is confirmed by all witnesses except W1, her best friend! This is another incredible fact showing the lack of any "probable cause" to request the warrant for the arrest of Giro. But for CUPD Defendants everything was ok. There was probable cause, and they requested and obtained the warrant for Giro's arrest and, as even the U.S. Court for the District of Colorado noticed, they went ahead maliciously prosecuting Giro, to protect CU from the investigation of the OCR about the handling of sexual misconduct by CU Boulder. We have to remember that CU Boulder was under extreme pressure, at that time, from media, public opinion and students because of the handling of sexual assault on campus.

**IV.    CUPD asks for the arrest of Girolamo Francesco Messeri. He was arrested, and after being arrested for 33 days he is released on bail and several other limitations.**

69.     On January 20, 2017, unknown to Girolamo, CUPD's Sergeant Steven Cowles requested

to the Judge of the Boulder District Court a Warrant for the arrest of Girolamo Francesco Messeri. Previously, on December 20, 2016, the same Sergeant asked for a search warrant of all documents related to Giro in custody of CU's OIEC. In the requests Sergeant Cowles lied to the Judge when he was under oath, deceived the Boulder County District Attorney, omitted exculpatory issues in favor of Giro, and added inexistent issues against Giro (Exhibits 12 and 13).

A)  Sergeant Cowles, in his request for both search and arrest warrant, at paragraph 13, states "Emily and Jamie left the room to go outside and smoke a cigarette". FALSE! They went out to smoke marijuana as the Sergeant knew very well from the interviews. Cowles was obviously in a difficult position to tell a Judge that CUPD did not a charge a minor for smoking marijuana. But the Officer needed Jane Doe statements in order to maliciously prosecuted Giro, and they granted her immunity. Again the Sergeant lies to the Judge, under Oath, when he writes that W1 asked W2 to escort her back to the room to get the car's keys. W2 has constantly denied that the keys were in the room! And W2 also denied the girls ever recovered the keys in his room, as did the other suitemate W3. So in the entire paragraph 13, the Sergeant is lying to the Judge. Also the last period of the paragraph ("Jamie and Emily then left the dorm and drove home") is false. We can easily see from the videos that the girls remained in the building for a long time, riding the elevator, taking pictures, laughing, and interacting with other boys. Obviously all this has been done by Cowles to show that Jane Doe was innocent, a victim and to accuse Giro, without even mentioning W2 statements and the elevator's video.

B) In paragraph 21 of the warrant request, Sergeant Cowles lies again. No one has ever said that Jane Doe was drunk. Giro in his only interview with CUPD said that Jane Doe was talking and walking normally. The Sergeant, again, tries to make a "dramatic picture" against Giro stating that Jane Doe was drunk and unable to give consent!

C) In paragraph 29 the Sergeant reports the statement of Officer Von Rivenburgh, saying that

Giro did not know how to ask in English "do you like it?" This point should have investigated more. But no one of CUPD Officer did it, because for them the important thing was maliciously prosecuting Giro and get him charged, arrested and possibly convicted, to show that CUPD and CU were tough on sexual misconduct.

D) In paragraph 31 the Sergeant totally contradicts what he wrote in paragraph 21! Now he writes what Giro has really said, that Jane Doe was not intoxicated. But this is in total contrast to what Cowles wrote (and Giro NEVER said!) in paragraph 21, that Jane Doe was drunk!

E) In paragraph 33 writes the BIGGEST LIE OF THE ENTIRE INVESTIGATION (together with the car's keys issue and the elevator's videos): He writes that Giro was expelled from CU on December 12, 2016. Unfortunately for Sergeant Cowles, this egregious lie falls down just looking at the CU' OIEC "Notice of Sanction" (Exhibit 2)! GIRO WAS EXPELLED ON NOVEMBER 24, 2016! In maliciously and falsely postponing Giro's departure date, the Sergeant wants to demonstrate to the Judge that Giro left the US before his expulsion, fleeing and thus becoming a fugitive of justice. False! He left the US on November 27, 2017 (Exhibit 14) after being expelled and having nothing to do in the US and no place to stay.This is the definitive proof of the malicious prosecution and the lack of cause.

F) In paragraph 34 the Sergeant confirms the CU policies of strict contact between OIEC and CUPD.

G) In paragraph 34 Cowles also incorrectly wrote Giro's name as "Taylor Girolamo Francesco Messeri". A demonstration of also how much care CUPD took in such a sensitive investigation!

H) In paragraph 37 Giro's name from "Taylor Girolamo Francesco Messeri" becomes "Giroloma Francesco Messeri"! No words!

Mysteriously Cowles asked a warrant for Sexual Assault (CRS 18-3-402(1)(a) and False Imprisonment (CRS 18-3-303(2)(a), and the Judge from Boulder County District, Combined Court,

Mr. David Archuleta, not only granted the warrant for such Felonies, but he added Unlawful Sexual Assault (CRS 18-303-(2)(a)!

70. The warrant for his arrest was totally unknow to Giro, as he was in Italy, and his Attorney even told him, in an email, that his was totally cleared by the Boulder County District Attorney. He came back to the US in May 2017, and for unknown reasons was not arrested at the airport entering the US. On November 24, 2017, during a routine traffic stop in Utah, where he lived and lives now, Giro was arrested on the outstanding warrant. He had to be extradited to Colorado and remained in jail for 33 days (also spending Christmas 2017 in Boulder County jail!) in inhuman conditions, some in general population, others in medium-security with even gangs' members! He was moved from different jails, in several States with inhuman transportation means (His father request to have him transported by plane, at his own expenses, was not even considered. Exhibit 15).

71. Giro was released from Boulder County jail on December 27, 2017, after 33 days in various jails, as we wrote, on a $ 10,000 (Ten thousand Dollars) bail, he had to surrender his Passport, was subject to pre-trial supervision, and had to ask the Court to be allowed to go back to Utah, where he lives and worked (he had to wait 11 days in a Boulder Hotel before the Court allowed him to move) (Exhibit 16 and 17). Practically he was not free to travel.

72. His case was on all main newspapers and his reputation destroyed (Exhibit 18). He suffered injury to personal and business reputation, and to the goodwill business, caused by the illegal seizure that received extended coverage by the press. He was fired and not rehired because of the illegal procedure. (*Marrero v. City of Hialeh, 625 F.2d 499, 5th Circuit*).

**V.   The pre-trial hearing and the Boulder County District Attorney ask for the dismission of the case.**

73. On April 12, 2018 the pre-trial hearing was held in Boulder County District Court on

Giro's criminal case (Exhibit 19 related to the depositions of Officers Berry and Von Rivenburgh).

CUPD's Officer Chadwick Berry was questioned under oath by the Boulder County District

Attorney and by Mr. Jason Savela, Giro's Attorney. He stated that:

- Jane Doe smoked a cigarette (we very well know that she smoked marijuana).

- He confirmed that Jane Doe admitted drinking (she was under-age and all CUPD's Officer granted

her immunity just to have Giro accused!) and he admitted Jane Doe admitted a crime!

- He confirmed Jane Doe was following Giro when they moved from the futon to the bathroom, and

Officer Berry had no impression she was forced into the bathroom (No grabbing, no pulling)!

Officer Von Rivenburgh was also questioned by the District Attorney and by Mr. Savela at the

same

hearing. He stated that:

- He had difficulties understanding Giro because of his accent, but he willingly omitted to notice

that Giro, being English not his primary language could have had some "language problems" in his

interview with CUPD and with his communications with Jane Doe!

- W1 described Giro being forceful pulling Jane Doe toward the bathroom (in contrast with W2!).

- He interviewed Jane Doe with Corporal Pacheco.

- He admitted that he let the representative of the OVA (Office of Victims' Assistance from CU) to

talk to Jane Doe before he interviewed her, so having OVA giving "hints" before CUPD talked to

her! This is another proof of the malicious prosecution of Giro: the "deference" toward CU!

Officers did something against the rules, letting OVA speak to Jane Doe before the Police! And

they have broken the rules too when they allowed Jane Doe's brother and OVA's representative to

be present at the Police interview!

- He confirmed Jane Doe said that she was not forced into the bathroom (in contrast with W1,

again).

- He stated that Jane Doe did not say during her first interview that she tried to scream or make a lot of noise, and that she changed opinion in her following interview.

- He confirmed that during the "elevator's ride" (after the alleged assault and leaving the building), the girls "appeared jokingly, acted like they were having fun, and W1 hit all the buttons on the elevator (this is false because from the video you can see Jane Doe pushing several buttons too!), and they rode floor to floor, and on each floor W1 would peek out, look, but then they sat there on the elevator and rode the elevator for a while, interacted with a few people, and then eventually they got off on the first floor and left". How can this behavior be consistent with a previous sexual assault in the same building, not only to a Police Officer, but to a normal person, is a remains an absurdity!

- He stated that, in the video of the "elevator ride" the girls were "using their phones and accessing Snapchat and Facebook". However, he did not subpoena that information! Why? Because that would have cleared Giro!

- At a certain point, an unknown male enters the elevator and W1 was smiling and talking to him. No request for help!

- Then the girls arrived back to the 14th floor and ran into W2. No car's keys were handled by W2 to the girls (so they always had the keys with them!), and the girls conversed with W2 (this is the time W2 requested the girls to leave, as he said in his interview).

- Officer Von Rivenburgh, pressed by Attorney Savela, explained what he asked Jane Doe and what answers he got back from her, about the elevator's ride. Mr. Savela asked Von Rivenburg: "And knowing that they just wanted to leave and that they clearly had their keys at this point in time, you had to wonder why they would ride around in this elevator for a while". Answer: "Right". Question: "And you asked E.M. (Jane Doe) well, what was your demeanor, what was your attitude, how did you feel when you got on the elevator to leave, right?". Answer: "I did". Q.: "And she described that, right?". A.: "She did". Q.: "What did she describe?". A.:"She described kind of having an

intoxicated feeling. She described being, you know, feeling – I guess feeling good based on her alcohol consumption I guess and just kind of being – I don't specifically remember how she stated it, but she felt good, said they were joking around kind of thing, in order to try and leave I guess". Q.: "She indicated she was numb, scared, felt terrible, right?". A.: "Correct". Q.: "That's what she initially said?". A.: "Right". Q.: "And then when you confronted her – and you confronted her with information, right?". A.: "I did show her the video and asked what was going on". Q.: "You showed her the full video, right?". A.: "Yes". Q.: "And that's when she said well, we were trying to find our way out of the building, right?". A.: "Yes". Q.: "She was indicating that she was having trouble leaving the building, right?". A.: "Correct". Q.: "That she didn't know where she was?". A.: "Right. I think she mentioned that they were looking out each floor to see if the exit was there". Q.: "And you confronted her with that issue, right?". A.: "I did. I said if, you know, I was lost, I'd go to the number 1 floor and try to figure out from there". Q.: "What did she respond to that?". A.: "I don't specifically remember. I don't recall. I know it is in my report. I just can't remember it". Q.: "She described why they might be smiling and laughing, right?". A.: "Correct".

So, Officer Von Rivenburgh does not remember the girl's answers to such an important set of questions! The truth is that, if we look at the transcripts of the depositions Jane Doe was not able to give convincing answers and CUPD's Officer never pressed her!

74.      After such disappointing depositions of CUPD's Officers at the pre-trial hearing, confirming in front of a Court the inexistence of probable cause, the Boulder County District Attorney decided to dismiss the case! On July 30, 2018, the District Attorney herself, asked the Boulder County District Court to dismiss the case against Girolamo Francesco Messeri. And on July 31, 2018 the Court granted the dismissal (Exhibit 20).

75.      The above-described conduct was the direct and proximate cause of tremendous damages to Plaintiff, Girolamo Francesco Messeri including, but not limited, economic losses, loss

of educational opportunities, loss of career opportunities, emotional distress, and other consequential damages. It was also the direct cause of tremendous emational distress for Plaintiffs Iole De Luca and Vincenzo Messeri, Giro's parents. <u>Defendants are liable in both individually and also in their official capacity of CUPD officers, being employees of the CUPD</u>.

<u>**COUNT I**</u>

<u>**42 U.S.C. § 1983: Violation of the Fourth Amendment – Malicious Prosecution - False Arrest and False imprisonment – Right to be free from unreasonable seizures**</u>
**(Against all Defendants individually and in their official capacity to include the University of Colorado Police Department)**

76.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

77.    As described more fully above, all of the Defendants, while acting individually, jointly, officially and in conspiracy, as well as under color of law deprived Plaintiff of his constitutional rights to be free of undue arrest and seizure, and free of being maliciously prosecuted.

78.    CUPD employed all Defendants and is responsible for their actions.

79.    Zak, as chief of CUPD, had a duty of supervising her subordinates. She did not do it, and worse, she was part the malicious prosecution of Plaintiff.

80.    In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, as well as fabricated other evidence, falsified dates and transcripts of witnesses' questioning, did not thoroughly examined Jane Doe and her witness, and also did not subpoena their social media and blogging activity, <u>jumped to the conclusion of an inexistent probable cause and showed no interest in corroborating the veracity of the report of sexual assault, thereby misleading and misdirecting the criminal prosecution of Plaintiff</u>. Their conduct was outside the scope of their job and should constitute a crime, actual fraud, and <u>constitute actual</u>

malice and willful misconduct. They acted in a way that constitutes a violation of the U.S. Constitution and clearly established laws that would have been apparent to any reasonable officer, and their behavior was not reasonable. They knew that they owed a duty of care to Plaintiff, and they breached that duty of care causing him several injuries. They obtained a warrant for Plaintiff's arrest without probable cause, failed to take basic investigatory steps that reasonable officers would have at least attempted, and showed little or no interest at all in establishing the truth. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

81.     The Defendant Officers' misconduct also directly resulted in the unjust criminal charges, arrest and seizure against Plaintiff, thereby denying him his constitutional right to be free of an undue arrest and seizure, therefore in violation of the Fourth Amendment of the United States Constitution. He spent 33 days in jail in inhuman conditions, some in general population, others in medium security with gangs members. He was moved from different jails in several States with inhuman transportation means. During his imprisonment he was extremely scared and frightened for his life. Some nights he could not even sleep, and others he was left to sleep on the floor for lack of beds. He was released from jail after 33 days on bail, but he was not free to travel, subjected to Passport's surrender, pre-trial supervision and not allowed to move out of the boundaries of the States of Colorado and Utah, from his arrest, on November 24, 2017, until the dismissal of his case on July 31, 2018, for a total of 8 months and 7 days.

82.     As a result of this violation of his constitutional right to be free of an unjust arrest and seizure, Plaintiff suffered injuries, including, but not limited to, emotional distress, damages to his reputation and other non-economic and economic damages, as is more fully alleged above. They caused him to suffer permanent and irreparable harm including severe emotional distress and psychological trauma. Further, he lost his job and a promising career at a 5 stars hotels' chain, not to mention the loss of education, and the financial resources he and his parents expended to get him

into and attend the University of Colorado in Boulder were wasted without compensation or return so far.

83.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights. Defendants acted intentionally to produce emotional distress, recklessly in deliberate disregard of a high degree of probability that emotional distress will follow. Their conduct was so extreme and outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. They intentionally and recklessly caused Plaintiff to suffer emotional distress and damages that are so severe that no reasonable man could be expected to endure.

84.     Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner clearly indicative of innocence.

85.     The Defendant Officers identified above accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors and judges with the intent of exerting influence to institute and continue the judicial proceedings with reckless disregard for the truth.

86.     Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. In so doing, the Defendants fabricated evidence and withheld exculpatory information, maliciously prosecuted an innocent in a case not supported by probable cause, violated, as we have already written, the Fourth Amendment of the U.S. Constitution and established laws, conducted actions flawed by grave procedural errors, prosecuted with lack of cause, false arrest, false representation, undue detention,

negligence, gross negligence and lack of due care.

87.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

88.     Accordingly, all Defendants individually and in their official capacity (CUPD) are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violation of the Fourth Amendment – Malicious Prosecution - False Arrest and False imprisonment and the Right to be free from unreasonable seizure, and for all damages arising therefrom. They initiated and continued a criminal investigation just in order to protect CU Boulder from OCR investigation, from the media and public opinion attacks on how the University handled sexual assaults on campus, without any factual or legal justification and totally lacking probable cause.

89.     As a direct and proximate result of the above misconduct, Plaintiff sustained, and continue to sustain enormous and irreparable injuries, pain, physical and psychological damages, suffering, including, without limitation, emotional distress, damages to his reputation, loss of educational opportunities, loss of career opportunities, economic and monetary injuries and other direct and consequential economic and non-economic damages that in some cases are permanent, and he is entitled to recover all damages from Defendants individually and in their official capacity (from CUPD).

90.     Plaintiff further seeks exemplary punitive damages against all Defendants.

## COUNT II
### Intentional Infliction of Emotional Distress
### (Against all Defendants individually and in their official capacity to include the University of Colorado Police Department)

91.     Plaintiffs repeat and re-allege each and every allegation hereinabove as if fully set forth herein.

92.     Defendants were acting under color of state law.

93.     CUPD employed all Defendants and is responsible for their actions.

94.     Zak, as chief of CUPD, had a duty of supervising her subordinates. She did not do it, and worse, she was part of the malicious prosecution of Plaintiff.

95.     The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above. Defendants' conduct was outrageous because it goes beyond a reasonable person would regard the conduct as intolerable in a civilized community.

96.     Said actions and conduct did directly and proximately cause severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

97.     The misconduct described in this Count was undertaken with malice, willfulness, oppressively, fraudulently, and in conscious and reckless indifference to the rights of others.

98.     As a proximate result of Defendants' wrongful acts, Plaintiff suffered compensable damages, including severe emotional distress and anguish, as is more fully alleged above and is entitled to recover them from Defendants individually and in their official capacity (from CUPD).

99.     Plaintiff further seeks exemplary punitive damages against all Defendants.

**COUNT III**
**Negligent Infliction of Emotional Distress**
**(Plaintiffs Girolamo Francesco Messeri Against all Defendants individually and in their official capacity to include the University of Colorado Police Department)**

100.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

101.     Defendants were acting under color of state law

34

102.    CUPD employed all Defendants and is responsible for their actions.

103.    Zak, as chief of CUPD, had a duty of supervising her subordinates. She did not do it, and worse, she was part of the malicious prosecution of Plaintiff.

104.    Defendants' owed a duty to act as reasonably prudent persons. This duty includes an obligation to act in a careful, lawful, and prudent manner and in full compliance with applicable laws.

105.    Defendants' toward plaintiffs resulted in a breach of Defendants' duties to act as reasonable, prudent persons.

106.    Emotional distress was a field of danger that Defendants should have anticipated and guarded against.

107.    Plaintiff suffered tremendous pain, physical and psychological damages, suffering, including, without limitation, emotional distress, total stress and anxiety, and horrible pain and physical damages.

108.    As a proximate result of Defendants' wrongful acts, Plaintiff suffered compensable damages, including severe emotional distress and anguish, and physical damages as is more fully alleged, above and they are entitled to recover them from Defendants individually and in their official capacity (from CUPD).

109.    Plaintiff further seeks exemplary punitive damages against all Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     on the first count for 42 U.S.C. § 1983: Violation of the Fourth Amendment – Malicious Prosecution - False Arrest and False imprisonment and the Right to be

free from unreasonable seizures, against, CUPD, Zak, Cowles, Kish, Pacheco, Berry, Von Rivenburg, Norton, Stevenson and Heskett, a judgment against these Defendants individually and in their official capacity (from CUPD), awarding Plaintiff present and future damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment and post-judgment interests, attorneys' fees for this action and for the criminal charges he faced, expenses, costs, and disbursements; exemplary punitive damages for Plaintiff Girolamo Francesco Messeri.

(ii)   on the second count for Intentional Infliction of Emotional Distress, against CUPD, Zak, Cowles, Kish, Pacheco, Berry, Von Rivenburg, Norton, Stevenson and Heskett, a judgment against these Defendants individually and in their official capacity (from CUPD), awarding Plaintiff present and future damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, plus prejudgment and post-judgment interests, attorneys' fees for this action and for the criminal charges he faced, expenses, costs and disbursements; exemplary punitive damages for Plaintiff Girolamo Francesco Messeri.

(iii)   on the third count for Negligent Infliction of Emotional Distress, against CUPD, Zak, Cowles, Kish, Pacheco, Berry, Von Rivenburg, Norton, Stevenson and Heskett, a judgment against these Defendants individually and in their official capacity (from CUPD), awarding Plaintiff present and future damages in an amount to be determined at trial, including, without limitation, damages to physical well-

being, emotional and psychological damages, plus prejudgment and post-judgment interests, attorneys' fees for this action and for the criminal charges he faced, expenses, flights and staying costs, and disbursements; exemplary punitive damages for Plaintiff Girolamo Francesco Messeri.

(iv)     Awarding Plaintiff any other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: July 22, 2020                              Respectfully submitted,

By: Girolamo Francesco Messeri Messeri, *pro se*

1043 Oberland Drive

Midway, Utah 84049

(385) 277-9534

girolamo1997@gmail.com